## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ALFRED HUBBARD, | ) | CASE NO. 5:12CV1124 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| PPG INDUSTRIES, INC. et al., | ) | **AND ORDER** |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion for summary judgment filed by defendant Webex, Inc. (Doc. No. 41.)[1] Plaintiff filed a response in opposition (Doc. No. 53), and Webex filed a reply (Doc. No. 56). Several deposition transcripts were also filed in support of the briefing. (Doc. Nos. 42, 44-52.) On June 24, 2014, the Court entertained oral argument with respect to the motion. For the reasons set forth below, the motion is **DENIED**.

## I. BACKGROUND

Plaintiff Alfred Hubbard ("Hubbard" or "plaintiff") was, at relevant times, employed by PPG Industries, Inc. ("PPG") as a "winder operator" on PPG's Teslin[2] number four production line. (Hubbard Dep. [Doc. No. 42] at 303-05.) His job included operating machinery manufactured by Webex, containing high-speed industrial rollers with readily identifiable "nip points[.]" (First Amended Complaint ("Compl.") [Doc. No. 13] ¶¶ 5, 6.) On February 10, 2011,

---

[1] There were originally two defendants: PPG Industries, Inc. and Hancock Engineering, Inc. The latter was dismissed on September 7, 2012, when plaintiff filed his first amended complaint, eliminating Hancock and adding Webex. PPG Industries, Inc. was dismissed with prejudice by joint notice of the parties approved on April 9, 2014. Therefore, Webex is now the only remaining defendant.

[2] "Teslin" is described in plaintiff's response in opposition to the motion as "a specialty paper-like plastic product manufactured by PPG at its Barberton, Ohio plant." (Response at 849.)

while working on this machine, plaintiff's right thumb was caught in an unguarded nip point and partially amputated. (*Id.* ¶ 9.)

William Vance, who was the supervisor on line four at the time of Hubbard's accident, testified that the winder machinery[3] is at the end stage of a multi-step manufacturing process. The Teslin sheet is first extruded and thinned. Oil used in the process is then extracted, the thickness of the sheet is checked, and the product is dried. (Vance Dep. [Doc. No. 52] at 822.) Once dried, the product must be trimmed to a customer's width requirements and rolled for shipment. The trimming is in two stages—initial and final; the part of the machine operated by Hubbard did the final trim. (*Id.* at 823.)

The Teslin is pulled into the winder machinery using a combination of two rollers: a stainless steel, motorized roller on the bottom and a rubber-covered, non-motorized roller on the top, called the "nip roll." (Berceau Dep. at   494.)[4] The Teslin is cut to final specifications by two separate knives in the machine that are set and regulated by the winder operator from his/her position on an elevated platform (a "catwalk") above the nip roller. The excess Teslin trim is supposed to be sucked into vacuum tubes next to the cutting knives. After

---

[3] There are photographs of the machine attached to the deposition of Jim Berceau, Webex's engineering manager, who explained that the photographs were taken just prior to shipment of the machine. The machine is shown partially disassembled in the photographs, and there is cardboard and masking tape protecting the roller surfaces. (Berceau Dep. [Doc. No. 45] at 483, 491-92, and Webex Exs. A, B, and F.)

[4] Ordinarily, the Teslin being run through the winder is ten millimeters thick or more. Typically, the average speed of the rollers would be about 70 feet per minute; the speed would be slower on thicker product and faster on thinner. (Doty Dep. [Doc. No. 50] at 732; *see also* Canfield Dep. [Doc. No. 48] at 628 (14-millimeter product runs at 39 feet per minute; 4-millimeter product runs at 71 feet per minute).) The line four machine had the capacity to run at 200 feet per minute, but Doty did not think it had ever been run at that speed. (Doty Dep. at 733.) On the day of Hubbard's accident, PPG was doing a trial run on six-millimeter Teslin, trying to eventually get down to four millimeters. Thinner Teslin is difficult to work with. (*Id.* at 733, 734.) The line speed for the six-millimeter product was 110 feet per minute. (*Id.* at 734.) Hubbard stated that he had never before run four-millimeter product, and had never before seen the line run as fast as it was running on the day of his accident. (Hubbard Dep. at 322, 331.)

2

being cut to specification, the Teslin is wound onto a final roller for delivery to the customer. (Hubbard Dep. at 326; Doty[5] Dep. at 718-19.)

The winder operator has several duties, including clearing excess Teslin trim that is not properly sucked up by the vacuum tubes. (Doty Dep. at 726.) Failure to clear the problem trim could cause it to fall and collect on the floor, get caught on the rollers or in the nip point, or to "wrap up," which would result in marks on the finished sheet—a quality issue. (*Id.* at 729; Williams[6] Dep. [Doc. No. 49] at 656.)

To prevent excess trim from becoming stuck in the nip point or from wrapping up, Hubbard, as he claims to have been trained, would attempt to cut, tear, or pull the Teslin. (Hubbard Dep. at 316, 328-29.) In fact, these are the very actions he took on February 10, 2011, when he saw excess trim getting stuck in the vacuum and backing up. When he first failed to remove the excess with his box-cutter knife (which got caught between the rollers, but he pulled it out), he grabbed the excess trim with his right hand to pull it out of the machine. His hand was within four inches of the nip point, which caught hold of his right thumb. He claims to have pulled a nearby stop cord, to no avail; so he simply pulled his thumb out of the nip point, partially amputating it in the process. (*Id*. at 328-29, 344-45, 395.)

It is undisputed that, at the time of Hubbard's accident, although there was an "E-stop pull cord associated with the nip[,]" (Berceau Dep. at 492), as well as stop buttons on a panel at the end of the machine (Williams Dep. at 657-58), there was no physical barrier to prevent a body part from entering the machine (Doty Dep. at 717).

---

[5] Amy Doty is the "[a]rea technical supervisor on the optical side of the [PPG] plant." (Doty Dep. at 711.)

[6] Jeffrey Williams, another winder operator, was one of several people who trained Hubbard for his winder job on line four at PPG. (Williams Dep. at 653-54.)

Hubbard claims that, when he had his accident, both he and his coworker, Tim Adkins, pulled the emergency cord to stop the rollers, to no avail. (Hubbard Dep. at 329, 405.) But Adkins testified that he did not pull the cord and he did not think Hubbard pulled it either. (Adkins Dep. [Doc. No. 47] at 595.) Doty testified that the post-accident investigation suggested that the cord had never been pulled, as evidenced by the fact that a built-in sensor (which would require resetting) had not been tripped. In addition, the computer system monitoring the machine had not registered that the cord had been pulled. (Doty Dep. at 741-42.)

Hubbard claims he was never trained not to put his hands near the rollers; in fact, he claims he was trained by Williams to use his hands to remove excess trim that was caught in the machine. (Hubbard Dep. at 314-15.) Williams emphatically denies ever instructing Hubbard in that fashion. (Williams Dep. at 659-60.) Hubbard also denies knowing that, should his hand come in contact with the moving rollers, it would get caught, or that the nip point posed a danger to him. (Hubbard Dep. at 392, 396-97.) He claims he was taught that, if he simply pulled the cord, the nip would be lifted and the roller would stop. (*Id.* at 405.)

On September 7, 2012, plaintiff filed his first amended complaint, wherein he sets forth a strict products liability claim against Webex. Plaintiff claims that Webex "designed, manufactured, installed and/or supplied an unreasonably dangerous product which did not include adequate safety guards at clearly hazardous areas of the machinery, specifically the 'nip points' between the machine's rollers." (Compl. ¶ 13.) He alleges that Webex is "strictly liable in tort pursuant to [the Ohio Products Liability Act] for the defective manufacture and/or design and/or supply of the machine which Plaintiff Alfred Hubbard was working upon on February 10, 2011." (*Id.* ¶ 16.)

## II. DISCUSSION

**A.** **Summary Judgment Standard**

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors

5

could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

## B.    The Parties' Positions

Webex's motion for summary judgment is based on a single argument: that the strict products liability claim against it in count II of Hubbard's complaint[7] fails because of the defense of assumption of risk, which is an absolute bar to recovery. Defendant asserts that, even if its product were defective, assumption of the risk shields it from liability. (Motion at 222 [citing *Carrel v. Allied Prods. Corp.*, 78 Ohio St. 3d 284, 289 (1977); *Briney v. Sears, Roebuck & Co.*, 782 F. 2d 585 (6th Cir. 1986); Ohio Rev. Code § 2307.711].)

---

[7] Count I is a claim for intentional tort against PPG only. That count has been dismissed by virtue of the dismissal of PPG.

6

In defendant's view, the "only issue in dispute" is whether it owed a duty to plaintiff, a question that is a matter of law for the Court. (Motion at 224.) Defendant asserts that Hubbard knowingly reached down to the rollers on the winder with his hand, "expressly assum[ing] a known risk[.]" (Motion at 222.) Defendant also argues that, because the risk was common knowledge and was open and obvious, there was no duty to warn of any possible danger.[8] (*Id.* at 223 [citing *Livengood v. ABS Contractors Supply*, 126 Ohio App. 3d 464, 466 (Ohio Ct. App. 1998); *Hanlon v. Lane*, 98 Ohio App. 3d 148 (Ohio Ct. App. 1994); *Taylor v. Yale & Town Mfg.*, 36 Ohio App. 3d 62 (Ohio Ct. App. 1987)].) Finally, defendant asserts that plaintiff "made a conscious and voluntary decision to reach into the rollers and remove the scrap trim with his hand." (Motion at 224.)

In opposition, plaintiff argues that *implied* assumption of risk, the only theory he believes is implicated by Webex's motion (Resp. at 863), does not apply in this case.[9] Plaintiff points to *Cremeans v. Willmar Henderson Mfg. Co.*, 57 Ohio St. 3d 145 (1991), which he says "created a 'normal performance of required job duties and responsibilities' workplace exception to the implied assumption of the risk defense." (Resp. at 864 [also citing *Carrel*, 78 Ohio St. 3d at 290 (an employee does not assume a risk when "required to encounter the risk while performing normal job duties")].) Finally, plaintiff argues that, even without the exception to the assumption of risk doctrine, there are material factual disputes as to whether plaintiff did assume the risk. (*Id.* at 865.)

---

[8] The Court notes that there is no failure to warn claim in the complaint.

[9] Plaintiff devotes several pages to an argument that the machine manufactured by Webex is defective. This argument is superfluous since, for purposes of its motion, Webex concedes that fact, but argues that it has a viable defense—assumption of risk—that is an absolute bar to liability. (Motion at 222.) Plaintiff did not himself move for summary judgment on the question of whether the product is defective. Therefore, the Court need not consider the argument contained on pages 858-862 of plaintiff's response. Rather, the Court's consideration begins with Section C on page 862, where plaintiff addresses the defense raised by Webex.

In reply, defendant argues that, since April 7, 2005, the effective date of Ohio Rev. Code. § 2307.711, the contributory fault of the plaintiff is to be considered on all product liability claims. However, defendant acknowledges that this would be a matter for a fact-finder. (Reply at 906.) Defendant insists that the only question for the Court on summary judgment is "whether an exception to the implied assumption of the risk defense is applicable on the instant matter." (*Id.*) In particular, the question is whether plaintiff "was required to encounter the risk while performing normal job duties." (*Id.* [citing *Vold v. ARPAC, LP*, Case No. 3:07-CV-1509, 2008 WL 2788727 (N.D. Ohio July 17, 2008)].)

**C.      Assumption of Risk**

The Ohio Products Liability Act ("OPLA"), Ohio Rev. Code § 2307.71, *et seq.*, controls products liability claims in Ohio. "To establish a design defect claim, a plaintiff must prove by a preponderance of the evidence that (1) the product manufactured and sold by the defendant had a design defect, (2) this defect existed at the time the product left the control of the manufacturer, and (3) the defect was the proximate cause of the injury for which recovery is sought." *Gumnitsky v. Delta Int'l Machinery Corp.*, 411 F. Supp. 2d 756, 762 (N.D. Ohio 2005) (internal citations omitted); *Kaiser v. ODB Co.*, No. 1:10-CV-01499, 2011 WL 3040085, at *3 (N.D. Ohio Jul. 25, 2011) (citing *Gumnitsky*; *Aldridge v. Reckart Equip. Co.*, No. 04CA17, 2006 WL 2716696, at *7 (Ohio Ct. App. Sept. 19, 2006)).

Ohio Rev. Code § 2307.711(B) establishes that assumption of the risk is an affirmative defense to a products liability claim and, once established, is a complete bar to recovery of damages.[10] In *Carrel*, *supra*, the Ohio Supreme Court held:

---

[10] The statute provides, in relevant part:

8

> In a products liability case, assumption of the risk may be a viable defense against an employee injured by a defective product in the workplace. An employee will be deemed to have voluntarily exposed himself or herself to a risk when he or she has elected to use a defective product. However, the defense of assumption of the risk is not available when the employee is required to encounter the risk while performing normal job duties. (*Cremeans v. Willmar Henderson Mfg. Co.* [1991], 57 Ohio St. 3d 145, 566 N.E.2d 1203, explained and followed.)

*Carrel*, 78 Ohio St. 3d at 284, Syllabus ¶ 2.

Under *Carrel* and *Cremeans*, the question for this Court on a motion for summary judgment based on the defense of assumption of risk is whether there are any material facts in dispute relating to whether Hubbard, while performing normal job duties, was required to encounter the risk that resulted in his injury.

> . . . For the defense of assumption of the risk to act as a bar to recovery of damages, the defendant must establish that the plaintiff knew of the condition, that the condition was patently dangerous, and that the plaintiff voluntarily exposed himself or herself to the condition. . . . Ordinarily, assumption of the risk is a question of fact, to be resolved by the factfinder. . . .

*Carrel*, 78 Ohio St. 3d at 289 (citation omitted).

The Court concludes that the evidence submitted does not support a ruling as a matter of law that Hubbard assumed the risk of the injury that he suffered. For instance, there are material factual disputes regarding how Hubbard was trained with respect to removal of the

---

(A) Subject to divisions (B)(1), (2), and (3) of this section, sections 2315.32 to 2315.36 of the Revised Code apply to a product liability claim that is asserted pursuant to sections 2307.71 to 2307.80 of the Revised Code.

(B)(1) Express or implied assumption of the risk may be asserted as an affirmative defense to a product liability claim under sections 2307.71 to 2307.80 of the Revised Code, except that express or implied assumption of the risk may not be asserted as an affirmative defense to an intentional tort claim.

(2) Subject to division (B)(3) of this section, if express or implied assumption of the risk is asserted as an affirmative defense to a product liability claim under sections 2307.71 to 2307.80 of the Revised Code and if it is determined that the claimant expressly or impliedly assumed a risk and that the express or implied assumption of the risk was a direct and proximate cause of harm for which the claimant seeks to recover damages, the express or implied assumption of the risk is a complete bar to the recovery of those damages.

Ohio Rev. Code § 2307.711.

excess Teslin trim and as to whether he was compelled as part of his employment to "encounter the risk" inherent in using his hand to clear the scrap. Hubbard claims he was trained to use his hand, if only as a last resort after trying a knife and, perhaps, an air wand,[11] to remove the excess trim which was, at almost all cost, to be prevented from building up in a way that would cause the customer's Teslin product to be damaged or rendered defective; he claims Williams showed him how to remove the trim in that way. Williams, who was one of Hubbard's trainers, says he would never have instructed Hubbard in that fashion and Hubbard would never have seen him reaching his hand into the machine to remove trim. Doty confirms that, when excess trim was stuck in the machine, an air wand was to be used to remove it, not one's hand, and that Hubbard's training would have been to that effect.

Whether any of Hubbard's assertions are believed (or even believable) is not a matter for this Court to determine on summary judgment. These issues of material fact are matters for a jury to determine.

Accordingly, the Court concludes that summary judgment for Webex must be denied. Given the current factual disputes, the Court is in no position to decide, as a matter of law, whether the defense of assumption of risk will bar Hubbard from recovery.

---

[11] Although Williams testified that there was an air wand near the machine that was to be used to remove excess trim that was not properly vacuumed, he admits he never trained Hubbard to use the wand because he thought it was a simple process and training was not necessary. (Williams Dep. at 656, 661.) Hubbard insists that the air wand was only used for cleaning. (Hubbard Dep. at 315.)

## III. CONCLUSION

For the reasons set forth herein, the Court finds that there are material factual disputes, and Webex's motion for summary judgment (Doc. No. 41) is **DENIED**.

Unless timely notified by the parties that the case has been resolved, the trial shall commence on July 21, 2014 at 8:00 AM.

**IT IS SO ORDERED**.

Dated: June 25, 2014

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

11